982 F.2d 525
 NOTICE: Eighth Circuit Rule 28A(k) governs citation of unpublished opinions and provides that they are not precedent and generally should not be cited unless relevant to establishing the doctrines of res judicata, collateral estoppel, the law of the case, or if the opinion has persuasive value on a material issue and no published opinion would serve as well.
Richard L. GODAR, Appellee/Cross-Appellant,
v.
PETROLITE CORPORATION, Appellant/Cross-Appellee,
 Nos. 91-3087, 91-3088.
 United States Court of Appeals,
Eighth Circuit.
 Submitted: April 15, 1992.
Filed: October 29, 1992.
 
 Before McMILLIAN and BOWMAN, Circuit Judges, and EISELE,* Senior District Judge.
 PER CURIAM.
 
 I.
 
 1
 The plaintiff, Mr. Richard L. Godar, filed his Complaint in the United States District Court for the Eastern District of Missouri on May 9, 1986, seeking damages and other relief under the Age Discrimination in Employment Act (ADEA). Mr. Godar had been employed by the defendant, Petrolite Corporation, in the position of Junior Chemist and later as Group Leader in the defendant's research department. He claimed in his Amended Complaint that he was discharged on August 12, 1985, "solely or substantially because of his age" in violation of Section 4(a)(1) of the ADEA. He also claimed that his discharge was "willful" within the meaning of the ADEA. He sought reinstatement, lost wages and other benefits, and reasonable attorney's fees. The defendant in its Answers generally denied the material allegations of the Amended Complaint and also asserted as its "First Defense" that the plaintiff had failed to mitigate his damages by not "actively and earnestly" searching for or accepting other employment.
 
 
 2
 It was stipulated that the plaintiff was employed by the defendant from November 8, 1954, until August 12, 1985, and that the plaintiff's rate of pay at the time of his discharge was $4,225.00 per month. It was also stipulated that 16 other named individuals in the defendant's Industrial Chemical Group were terminated in late July and August, 1985, and that the plaintiff and Mr. Tom Wells were terminated from the defendant's Research and Development Group on or about August 12, 1985.
 
 
 3
 After a three day trial the jury answered certain interrogatories in open court:
 
 
 4
 THE COURT: All right, sir. I'll ask the clerk to announce the verdict.
 
 
 5
 THE CLERK: Question number one: Do you find from a preponderance of the evidence that plaintiff's age was a determining factor in defendant's decision to discharge plaintiff?
 
 
 6
 Answer: Yes.
 
 
 7
 Number two: What amount of damages did the plaintiff sustain as a result of his discharge by defendant?
 
 
 8
 One Hundred and ninety-three thousand dollars.
 
 
 9
 Number three: Do you find from a preponderance of the evidence that defendant's decision to discharge plaintiff was willful as defined in the instructions?
 
 
 10
 Answer: Yes.
 
 
 11
 Appendix at 25. Because of the jury's finding that the plaintiff's discharge was "willful", the lower court on July 1, 1988, entered judgment in favor of the plaintiff in double the amount of the actual damages, i.e., in the total amount of $386,000.00.
 
 
 12
 On October 10, 1989, the lower court ordered the defendant to reinstate the plaintiff to his former position. On May 31, 1991, the lower court awarded the plaintiff an additional sum of $51,098.37 for compensation lost between the date of the jury's verdict and the date of the plaintiff's reinstatement. It accepted the figure of $67,688.00 as the value of the plaintiff's annual compensation package. The period of time involved was 1.435 years. Therefore, the base figure came to $97,147.01. However, the court reduced this figure by the amount the plaintiff earned from his labor in managing his properties (the Natural Bridge Apartment Complex) and also by the amount the plaintiff realized from owning and operating a retail coin shop (Danrich). The court assessed the former at $9,775.64 and the latter at $36,300.00, or a total of $46,075.64. This amount was subtracted from the base figure of $97,174.01 to arrive at the additional compensation figure of $51,098.37.[1] The plaintiff was also awarded $29,973.50 in attorney's fees by Order entered September 8, 1988. Both parties agree that a mistake occurred in the calculation of the attorney's fee. The lower court awarded the plaintiff the fee requested but a reexamination revealed that the sum requested should have been $28,851.00, some $1,392.00 less than awarded.
 
 
 13
 The defendant appellant made oral motions for directed verdict at the close of the plaintiff's case and at the close of all the evidence. On July 18, 1988, the defendant filed a Motion for Judgment Notwithstanding the Verdict and a Motion for New Trial.[2]
 
 
 14
 These two motions were denied by the lower court in its Order of September 8, 1988.
 
 
 15
 By its appeal the appellant, in its own words, seeks:
 
 
 16
 1. Reversal of the trial court's order denying Petrolite's motion for judgment NOV and, alternatively, a new trial, on the issue of finding a willful violation and the liquidated damage award.
 
 
 17
 2. Reversal of the trial court's order denying Petrolite's motion for a directed verdict that Plaintiff's evidence failed to establish a prima facie case and that Plaintiff, after December 1, 1985, had failed to mitigate his loss of earnings * * *
 
 
 18
 3. Reversal of the trial court's order denying Petrolite's motion for judgment NOV and, alternatively, a new trial on the issue of finding an ADEA violation.
 
 
 19
 4. Reversal of the trial court's order on damages denying Petrolite's motion for judgment NOV or, alternatively, direct a new trial or direct the trial court to reduce the backpay award * * *
 
 
 20
 5. Reversal of the trial court's order of May 31, 1991, to reduce the frontpay award * * *
 
 
 21
 6. In the event the Court rules favorably on this appeal, Petrolite requests a reduction in total or, alternatively, a proportionate reduction of attorney's fees * * *
 
 
 22
 Brief for Appellant at 48-50 (emphasis original).
 
 II.
 
 23
 The defendant contends there was insufficient evidence to support the jury's verdict that the defendant violated the ADEA and that such violation was willful. Thus, the defendant argues, the trial court erred in denying its Motion for Judgment Notwithstanding the Verdict and Motion for New Trial.
 
 
 24
 In Johnson v. Minnesota Historical Society, 931 F.2d 1239 (8th Cir. 1991), a reduction-in-force case, this Court discussed the elements necessary to establish a prima facie case of age discrimination:
 
 
 25
 (1) [The plaintiff] was between 40 and 70 years old at the time of his termination;
 
 
 26
 (2) [The plaintiff] was performing his job at a level that met the defendant's legitimate expectations;
 
 
 27
 (3) Despite his performance in his job, [the plaintiff] was terminated;
 
 
 28
 (4) [The plaintiff's] job in its various parts continued in existence;
 
 
 29
 (5) [The plaintiff's] age was a determining factor in the defendant's actions.
 
 
 30
 Id. at 1242-43 (footnote omitted). To establish that a violation of the ADEA is willful, the plaintiff must show that the defendant intentionally violated the ADEA or acted in reckless disregard for the matter of whether its conduct was proscribed by the ADEA. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 126 (1985).
 
 
 31
 Defendant argues that the plaintiff failed to establish a primi facie case in not proving that he was qualified for the position of chemist in Petrolite's reorganized fuel additives group. He also argues that no substantial evidence supports a finding that plaintiff's performance evaluation by the section heads was pretextual or that plaintiff's age was a determinative reason in his discharge.
 
 
 32
 Plaintiff views the factual context quite differently. He argues that the evidence shows that the events around August, 1985, "were in the nature of a replacement of plaintiff by a 26 year old rather than an actual reduction in force in Research and Development; and that the section heads were not the actual decision makers in the discharge," Appellee's brief, p.14. He argues that he was "uniquely qualified" for a position in the Fuel Additive's Group; that he had been demoted immediately prior to his discharge; and that he had continuously received merit raises for his performance as the leader of the Fuel Additive group. He further contends that:
 
 
 33
 The evidence showed a very systematic scheme to generate a pretext and manipulate events prior to discharge, to prompt a resignation by demotion and suggestion of early retirement, and at the time of discharge discourage Plaintiff from seeking an attorney and encourage him to waive his ADEA rights. There was also direct evidence of age animus and that Appellant was legally sophisticated and familiar with the Act.
 
 
 34
 Appellee's brief, p. 14-15.
 
 
 35
 From a careful review of the evidence, taking into consideration the reasonable inferences that could be drawn from that evidence, it is this Court's opinion that a reasonable jury could, on the basis of that evidence, find these factual issues in favor of the plaintiff, and thereby conclude, as the jury did here, that "plaintiff's age was a determining factor in defendant's decision to discharge plaintiff." Jury's answer to Interrogatory Number One. And although the issue is closer here, the evidence would also permit a reasonable jury to find, as the jury did here, that "defendant's decision to discharge plaintiff was willful as defined in the instructions." Jury's answer to Interrogatory Number Two.
 
 
 36
 There is evidence from which the jury could find that Mr. Godar was the "founding father" of defendant's Fuel Additive Group; that he created the first fuel addition products for the defendant back in 1957; that he was the first leader of the group; that he directed the group from the early 60's until July, 1985; that he received pay increases regularly; and that, although he was not qualified to do "hard core" chemistry, he was competent to perform the chemistry duties with which the Fuel Additive Group was usually concerned. Furthermore, Dr. Mange's ranking of the plaintiff emphasized plaintiff's problems with Marketing and with his supervision of his group. And the section heads did not refer to plaintiff's "rustiness" at "bench" work as the basis for their concurrence in the ranking decision mad by Dr. Mange.
 
 
 37
 Under the evidence it was open for the jury to question whether the section heads were the real decision makers in the process. The jury could have found that Dr. Tonkyn authorized Dr. Mange to rank those in Dr. Heinzelman's Section; Dr. Mange was the one who did that ranking; it was assumed the reductions would come from that section; Dr. Mange ranked the plaintiff alone in the lowest category of chemists and others in Dr. Heinzelman's Section; and that the section heads had little incentive and no substantial basis to make independent evaluations.
 
 
 38
 It was also open to the jury to question whether plaintiff's termination was truly a part of an active reduction in force in Research and Development. On the contrary, the jury could have found that a sophisticated process was being followed to, in effect, replace the plaintiff with a much younger person.
 
 
 39
 By the same token, it was open to the jury to find that the defendant's stated reasons for plaintiff's discharge, to-wit:
 
 
 40
 1. The alleged lack of cooperation with Marketing;
 
 
 41
 2. The alleged dissension within Mr. Godar's Group; and
 
 
 42
 3. The alleged "forced ranking" to effect an alleged "reduction of force."
 
 
 43
 Appellee's brief, p. 26.
 
 
 44
 were not the true reasons, i.e. that they were pretests. The "lack of cooperation with Marketing" assumes that the dissension involved resulted from plaintiff's failure to perform some duty imposed on him. But the jury could have found otherwise. Furthermore, Mr. Binz's and Mr. Corneli's testimony tended to negate the existence of such problems.
 
 
 45
 The alleged dissension in plaintiff's group centered on the dissatisfaction of Mr. Cunningham. But Dr. Mange and Dr. Tonkry knew that plaintiff had recommended Mr. Cunningham for promotion but did not so inform Mr. Cunningham, leaving it for the jury to infer that they did not wish to get rid of this problem but, rather, to use it as another pretest for plaintiff's discharge.
 
 
 46
 The "forced ranking" to effect the reduction in force could, under the proof, likewise, be viewed by the jury as simply a cover for a predetermined plan to get rid of the plaintiff.
 
 
 47
 Of course, the jury could have, as the basis of the evidence, agreed with the defendant appellant's views completely, but it was open to it to find as it did.
 
 
 48
 It was also open to the jury to find "wilfulness" under the statute on the basis of the evidence discussed above coupled with other evidence showing the awareness of the defendant of the provisions of the ADEA, the manner in which the discharge was effected, the sequence of events, plus the direct evidence of age animus, to wit, Dr. Mange's statement that the plaintiff was too old to go into Marketing and, in the unusual context here, the statement of Dr. Tonkyn concerning "early retirement," keeping in mind that Dr. Tonkyn determined who would rank the Heinzelman Section, that he was in charge of the Section and conducted the meeting of section heads. Appellee in his brief argues the following scenario:
 
 
 49
 A clear pattern is presented by the evidence. Petrolite begins generating problems for Mr. Godar in late 1984. A replacement is contemplated. Petrolite wants the replacement hired and trained before Mr. Godar is discharged. When Mr. Godar selects a older individual, his decision is promptly vetoed. Another individual is hired, age 26. After Mr. Godar has trained and acclimated his replacement, he is demoted. When he asks for reconsideration, Petrolite suggests he take early retirement. When he declines, he is discharged.
 
 
 50
 Appellee's brief, p. 25-26.
 
 
 51
 The evidence in this case would permit a reasonable jury to draw such inferences.
 
 
 52
 This Court recently explained in detail the legal standards applicable to j.n.o.v. and new trial motions. White v. Pence, 961 F.2d 776 (8th Cir. 1992). With respect to a motion for j.n.o.v., the White Court stated:
 
 
 53
 First, it is evident that the standards for considering a motion for j.n.o.v. differ thoroughly from those governing consideration of a motion for new trial. In a motion for j.n.o.v., the question is a legal one, whether there is sufficient evidence to support a jury verdict. This court must analyze the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility. We have also stated that to sustain a motion for j.n.o.v., all the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the nonmoving party. These principles have no application to the consideration of a motion for new trial on the ground that the verdict is against the weight of the evidence.
 
 
 54
 Id. at 779 (citations and footnotes omitted).
 
 
 55
 As to a motion for a new trial, the White Court articulated this standard:
 
 
 56
 With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence-it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.
 
 
 57
 * * *
 
 
 58
 [W]e made plain that the ultimate test [in determining whether to grant a new trial] was whether there had been a miscarriage of justice.
 
 
 59
 * * *
 
 
 60
 The district court's discretion is not boundless, however. We [have previously stated] that the district court is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusion or because judges feel that other results are more reasonable. We similarly observed that the trial judge may not usurp the functions of a jury ... [which] weighs the evidence and credibility of witnesses.
 
 
 61
 Id. at 780-81 (citations and internal quotations omitted).
 
 
 62
 The Court has reviewed the record as a whole and concludes that the lower court properly denied Petrolite's motion for judgment notwithstanding the verdict. When viewed in the light most favorable to Mr. Godar, the evidence is sufficient to support the jury's verdict in his favor.
 
 
 63
 With respect to Petrolite's motion for new trial, in White we stated "We have recognized the Supreme Court's pronouncement that the authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court, and that great deference is to be accorded the trial judge's decision in such rulings." 961 F.2d at 781 (citations and internal quotations omitted). This Court perceives neither a miscarriage of justice nor an abuse of discretion on the part of the lower court in denying Petrolite's motion for new trial.
 
 III.
 
 64
 Petrolite next appeals the lower court's denial of its motions for a directed verdict and for j.n.o.v. on the amount of backpay damages awarded to Mr. Godar. Petrolite argues that Mr. Godar failed to mitigate damages in that he did not make a reasonable effort to obtain employment substantially equivalent to his position with Petrolite or his training and background. See Coleman v. City of Omaha, 714 F.2d 804 (8th Cir. 1983).
 
 
 65
 Mr. Godar presented evidence that positions substantially equivalent to his employment with Petrolite were obtained through the industry "pipeline", that is, through inside contacts and contacts with recruiters and headhunters. He also presented evidence concerning his efforts to obtain comparable employment through the "pipeline" and other means, the availability of comparable positions and that his efforts to establish his own business were reasonable under the circumstances.
 
 
 66
 After a review of the record, the Court concludes that the lower court properly denied Petrolite's motions for directed verdict and j.n.o.v. on the issue of mitigation of damages. When analyzed in the light most favorable to Mr. Godar, the evidence is sufficient to support the jury's verdict. This Court cannot say that all the evidence points Petrolite's way and is susceptible of no reasonable inference adequately sustaining the position of Mr. Godar.
 
 IV.
 
 67
 By Order dated May 31, 1991, the lower court awarded Mr. Godar $51,098.37 ($51,056.54 by this Court's calculation) in frontpay, representing his damages from the time of the jury verdict (July 1, 1988) until Mr. Godar's reinstatement with Petrolite (November 1, 1989).
 
 
 68
 Both parties appeal the amount of the frontpay award. Petrolite contends that during the relevant period, Mr. Godar failed to seek comparable employment and is therefore not entitled to any frontpay. Petrolite also argues that even if Mr. Godar is entitled to frontpay, the lower court failed to adequately reduce the frontpay award by the amounts Mr. Godar earned from his property management business and his retail coin shop.
 
 
 69
 Mr. Godar, on the other hand, argues that the lower court erred by attributing to him, and thus reducing the frontpay award thereby, the entire $36,300 profit earned by the retail coin shop. Mr. Godar contends that one-half of those profits should be attributed to Mrs. Godar and added back to the frontpay award. Mr. Godar further argues that the lower court erred in its calculation of the amount of frontpay award reduction resulting from the management of the apartment complex.
 
 
 70
 The Court has reviewed the evidence, the parties' briefs, and the cases cited therein, with respect to the frontpay award issues raised in this appeal. With the exception of the minor mathematical error discussed supra, the Court finds no error in the lower court's calculation of the frontpay award.
 
 V.
 
 71
 The final issue before the Court concerns the award of attorney's fees. The lower court awarded Mr. Godar attorney's fees in the amount of $29,973.50. Petrolite contends that, as the result of a mathematical error on Mr. Godar's part, the correct attorney's fee should be $28,581.50. Mr. Godar does not contest this issue. The Court concludes that the proper amount of attorney's fees is $28,581.50.
 
 VI.
 
 72
 In conclusion, the lower court's order denying Petrolite's motions for j.n.o.v. and new trial is affirmed. The Order of May 31, 1991, awarding Mr. Godar frontpay is affirmed as modified to reflect a frontpay award in the amount of $51,056.54. The Order of September 8, 1988, awarding Mr. Godar attorney's fees is affirmed as modified to reflect an attorney's fee award in the amount of $28,581.50.
 
 
 73
 AFFIRMED.
 
 
 
 *
 The Honorable G. Thomas Eisele, Senior United States District Judge for the Eastern District of Arkansas, sitting by designation
 
 
 [1]
 There appears to be a slight error in the math. Our calculation results in a figure of $51,056.54 ($67,688 X 1.435 = $97,132.28 $46,075.64 = $51,056.54)
 
 
 [2]
 Since the issues on appeal refer directly to these two motions, we quote the grounds for each. The five stated bases for the former are:
 
 
 [1]
 Judgment Notwithstanding the Verdict is appropriate where, as here, the jury's verdict is not supported by substantial evidence
 
 
 [2]
 Herein, the jury finding that age played a determining factor in Defendant's decision to discharge Plaintiff is without substantial evidentiary support
 
 
 [3]
 Specifically, a reasonable jury could not find that Plaintiff, at the time of discharge, possessed the present ability to perform to Defendant's legitimate expectations as a bench chemist in Defendant's reorganized fuel additives group. Similarly, a reasonable jury could not find that the Defendant's decision was motivated by impermissible age bias. Simply put, Plaintiff's evidence, when viewed as a whole, is insufficient to support a finding that Defendant intentionally discriminated against Plaintiff due to his age
 
 
 [4]
 Alternatively, even if Plaintiff's evidence supports a finding of intentional age discrimination, this fact alone does not support a finding that Defendant's actions were willful. Herein, Plaintiff has not introduced additional evidence which would warrant the imposition of liquidated damages. Said damages are punitive in nature and should be the exception and not the rule in ADEA actions
 
 
 [5]
 Moreover, based upon Plaintiff's admissions, it is clear that he made no reasonable attempt to mitigate his damages, and he incurred a willful loss of earnings. Hence, Plaintiff's right to backpay is tolled
 Appendix at 31-32. The stated grounds for the Motion for New Trial were:
 
 
 [1]
 The Defendant is entitled to a new trial since the jury's verdict is against the weight of the evidence
 
 
 [2]
 The Defendant is entitled to a new trial since the jury's verdict is excessive
 
 
 [3]
 The Defendant is entitled to a new trial due to prejudicial judicial error
 Appendix at 33.